# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ERIC J. ROBERTS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12CV00013 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,**[1] | ) ) ) | By: James P. Jones United States District Judge |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Heather Fritts, Assistant Regional Counsel, and Kenneth DiVito, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the decision of the Commissioner.

I

Plaintiff Eric J. Roberts filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for supplemental security income ("SSI") pursuant to Title XVI of the Social Security

---

[1] Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Fed. R. Civil P. 25(d).

Act (the "Act"), 42 U.S.C.A. §§ 1381-83f (West 2012 & Supp. 2013).  Jurisdiction of this court exists under 42 U.S.C.A. § 1383(c)(3).

Roberts protectively applied for SSI on October 24, 2007, alleging disability beginning at birth due to tuberous sclerosis, fine and gross motor developmental delays, and seizures.  His claim was denied initially and upon reconsideration.  A hearing was held before an administrative law judge ("ALJ") on May 26, 2010, at which Roberts, represented by counsel, and a vocational expert ("VE") testified.  On July 29, 2010, the ALJ issued a decision finding that Roberts could perform a modified range of medium work, including jobs that existed in significant numbers in the national economy, and thus was not disabled under the Act.  Roberts requested review by the Social Security Administration's Appeals Council.  The Appeals Council denied his request for review, thereby making the ALJ's decision the final decision of the Commissioner.  Roberts then filed a complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been briefed.  The case is ripe for decision.

II

Roberts was 18 years old when his application was filed. He had no past relevant work and had not engaged in substantial gainful activity since his application date.

Roberts claimed to be substantially mentally impaired, though he testified that he was enrolled in only one special education class during his senior year of high school, graduated with a standard diploma, and attended community college. (R. at 43-44, 546.) Roberts was born with tuberous sclerosis, which caused developmental delays. (R. at 428.) At age nine, a school psychologist found Roberts to be functioning in the borderline range. (R. at 352.) Roberts has had skin lesions and lipomas surgically removed and has been prescribed Tegretol X-R and Lamictal for treatment of tuberous sclerosis. (R. at 363-77, 378, 430, 509-13, 562-66.) When Roberts was 17, his pediatrician, Suhasini Moparty, M.D., reported that he was doing well and that his tuberous sclerosis was controlled. (R. at 384.)

A number of doctors examined and evaluated Roberts during the relevant time period. In April 2008, John Litton, M.D., conducted a routine health screening and examination. (R. at 406.) Roberts complained of seasonal allergies and seizures, but indicated that he had not had a seizure in more than 60 months and did not experience seizures as long as he took his medication. (*Id.*) Dr. Litton

counseled Roberts to avoid various allergens and seizure triggers and to return in 3-4 months. (*Id.* at 408.)

At the request of the state agency, D. Kevin Blackwell, D.O., evaluated Roberts in June 2008. (R. at 412.) Roberts again reported that his seizures were well-controlled. (*Id.*) Dr. Blackwell noted that Roberts was alert, cooperative, and oriented times three with good mental status. (R. at 413.) Dr. Blackwell observed scoliosis, a depressed right shoulder, and slightly spastic movements. (R. at 414.) Roberts displayed some slight right facial nerve drooping and some slurred speech, as well as a slight twitch, and tended to pause before speaking. (*Id.*) Dr. Blackwell opined that Roberts would likely have difficulty with personal attendance and fine motor activities such as buttoning garments and tying shoes, and he might have some learning limitations. (*Id.*) Dr. Blackwell indicated that Roberts should not use his hands for long periods of time; should limit fine motor movements to less than one third of the day; should not crouch, kneel, crawl, perform safety-sensitive activities, climb ladders, or perform repetitive stair stepping. (R. at 414-15.) Dr. Blackwell noted that Roberts's communication was somewhat limited, but stated that he was capable of sitting for eight hours or standing for one hour per eight-hour day, assuming frequent positional changes, and could lift 10 pounds frequently and 25 pounds maximum. (R. at 415.)

B. Wayne Lanthorne, Ph.D., conducted a psychological evaluation in July 2008. Dr. Lanthorne's report indicates that Roberts was working for Virginia Workforce, though the type and frequency of work was not stated. (R. at 429.) Roberts again stated that his seizures were well controlled and that he had not experienced a seizure since the eighth grade. (R. at 430.) Roberts described helping with household chores and told Dr. Lanthorne that he likes to socialize. (*Id.*) During testing, Dr. Lanthorne noted that Roberts's thoughts were somewhat blocked and his thinking was somewhat slow. (R. at 431.) Dr. Lanthorne found that Roberts had a verbal IQ of 89, a performance IQ of 77, and a full scale IQ of 82, placing him in the low average range of intelligence. (*Id.*) Dr. Lanthorne found Roberts to be in the borderline range for rote and immediate memory functions, visual alertness to essential details in the environment, psychomotor speed and manual dexterity, and social confidence and facility in interpreting social situations. (R. at 432.) Dr. Lanthorne diagnosed borderline intellectual functioning and mental problems, and he assigned Roberts a Global Assessment of Functioning ("GAF") score of 70.[2] (*Id.*) He opined that Roberts was capable of functioning at a job. (R. at 433.)

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination. It is made up of two components: symptom severity and social occupational functioning. A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social,

Christopher Miller, M.D., a pediatric neurologist, saw Roberts in September 2008. Roberts again stated he was seizure-free and discussed his college plans. (R. at 459.) Several months later, in February 2009, Dr. Miller indicated that Roberts's condition met or equaled listing 11.03 of the Social Security Disability medical listings, but he provided no basis for this opinion. (R. at 520.)

Also in February 2009, Roberts, at his attorney's urging, revisited Dr. Litton. (R. at 521.) Dr. Litton reported that Roberts's tuberous sclerosis was stable and nonprogressive, and that his symptoms were relieved by medication. (*Id.*) Roberts also once again stated that he did not have any seizures as long as he took his medication. (*Id.*) On examination, Dr. Litton noted that Roberts avoided eye contact and had poor judgment. (R. at 522.) Dr. Litton indicated that it had taken Roberts two years longer than normal to graduate from high school but also noted that Roberts reported making fair progress in his community college classes. (R. at 523.) Dr. Litton provided the following opinion: "The natural history of tuberous sclerosis lends itself to moderate cognitive impairment. Thus, the probability that Eric will be able to sustain gainful employment will be very low. His neurologist has recommended that he apply for disability benefits and I am in agreement with that decision." (*Id.*) Dr. Litton opined that Roberts's condition met or equaled

---

occupational, or school functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

listing 11.02(b) of the Social Security Disability medical listings, but like Dr. Miller, he provided no explanation for that conclusion. Dr. Litton also completed an Assessment of Ability to Do Work-Related Activities (Physical) in which he indicated that Roberts could only occasionally climb, stoop, kneel, balance, crouch, and crawl, noting that his condition could potentially adversely effect his balance. (R. at 529.) Dr. Litton noted that Roberts experienced occasional difficulties with dexterity movements and had a speech impediment. (*Id.*) According to Dr. Litton, Roberts's impairment might require height and noise restrictions because external stimuli can effect his cognitive function. (R. at 530.) With no further explanation, Dr. Litton indicated that Roberts would be required to miss more than two days of work per month. (*Id.*)

Roberts visited Michael S. Dew, M.D., three times in late 2009. Dr. Dew noted that Roberts was doing fairly well despite not being entirely compliant with his medication regimen. (R. at 540-43.) Dr. Dew noted that an echocardiogram revealed a large pleural effusion, but Roberts had not experienced any symptoms from it and it was resolved by December 23, 2009. (R. at 539, 541.) There was a small, benign subpleural nodule in the right lung. (R. at 539.) An MRI showed a number of nodules in the brain consistent with tuberous sclerosis. (R. at 540.)

At the request of Roberts's attorney, Robert S. Spangler, Ed. D., performed a psychological evaluation in February 2010. (R. at 545.) Dr. Spangler noted minor

speech problems, awkward and slow fine motor movements, slowness when using math skills, and erratic concentration. (*Id.*) During this evaluation, Roberts for the first time stated that he had been experiencing depression, passive suicidal thoughts, and poor sleep. (R. at 546.) Dr. Spangler stated that Roberts was emotionally stable on medication. (R. at 547.) Roberts described attending community college classes two days a week for seven and a half hours per day, helping with a number of household chores, and driving locally. (*Id.*) Dr. Spangler diagnosed low average intelligence with moderate reading and math skills, limited sentence comprehension, erratic concentration, and visual perceptive disorder, among other things, and assigned a GAF score of 60-55. (R. at 548-49.) Dr. Spangler completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) in which he indicated that Roberts had good ability to follow work rules, relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, and function independently, but only fair ability to deal with work stresses or maintain attention and concentration. (R. at 552.) Dr. Roberts opined that Roberts would be unable to understand, remember, and carry out complex job instructions, but had fair ability when it came to detailed, but not complex, instructions and good ability as to simple job instructions. (R. at 553.) Dr. Spangler described as good Roberts's ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and

demonstrate reliability. (*Id.*) Dr. Spangler stated that "mild to moderate depression impacts all work-related activities, especially reliability," despite indicating elsewhere that Roberts had only mild depression on medication and was emotionally stable. (R. at 547, 554.) Finally, Dr. Spangler opined that Roberts would miss approximately two days of work per month due to his impairments. (R. at 554.)

Roberts visited Anne Jacobe, LCSW, in April 2010 for treatment of depression. (R. at 585.) Roberts stated he was feeling frustrated at school and depressed that it was difficult to find a girlfriend. (*Id.*) Jacobe diagnosed anxiety and recommended counseling sessions every one to two weeks for a total of ten sessions. (*Id.*) Jacobe completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form in which she indicated that Roberts had fair ability in every area except maintaining personal appearance (good ability) and dealing with work stresses and understanding, remembering and carrying out complex job instructions (poor to no ability). (R. at 588.) Jacobe opined that Roberts could not manage benefits in his own best interest and would be required to miss more than two days of work per month. (R. at 589.) She assigned Roberts a GAF score of 52. (R. at 585.)

Richard Surrusco, M.D., a state agency physician, reviewed Roberts's medical records in July 2008 and completed a Physical Residual Functional

Capacity Assessment in which he opined that Roberts could perform a modified range of light work. (R. at 420-26.) In August 2008, Donald Williams, M.D., also a state agency physician, completed another Physical Residual Functional Capacity Assessment and also concluded that Roberts could perform a range of light work with certain limitations. (R. at 451-57.) In January 2009, yet another state agency physician, Nisha Singh, M.D., concurred with Dr. Williams's assessment. (R. at 519.)

Julie Jennings, Ph.D., a state agency psychologist, reviewed Roberts's records in August 2008. (R. at 434-50.) She found only certain moderate limitations and concluded that Roberts was able to meet the demands of competitive work despite those limitations. (R. at 448-50.) John Parker, M.D., a state agency psychiatrist, reviewed Roberts's records in January 2009 and agreed with Dr. Jennings. (R. at 514-18.)

At the hearing, Roberts testified that he had failed a number of his community college courses, but he did pass his math class. (R. at 44-45.) He had been on the track and field and wrestling teams in high school. (R. at 50.) He further stated that he mowed the lawn, cleaned his room, put away his laundry, and took out the trash. (R. at 58.) The VE testified that a person with Roberts's assessed limitations, excluding the limitation of excessive absences, could perform certain light-to-medium unskilled jobs that existed in significant numbers in the

national economy. (R. at 61-65.) Roberts's counsel asked the VE whether Roberts would be able to perform any jobs based on the assessments of Dr. Spangler, Jacobe, and Dr. Litton, with no changes, and the VE responded that he would not. (R. at 66-67.)

The ALJ found that Roberts had the severe impairments of tuberous sclerosis with a history of developmental delays and borderline intellectual functioning, but that these impairments did not meet or medically equal a listed impairment. The ALJ concluded that Roberts could perform medium work limited to routine, repetitive tasks, including jobs that existed in significant numbers in the national economy, and thus was not disabled under the Act.

Roberts argues that the ALJ did not make sufficient findings regarding whether his impairments met or medically equaled any listed impairments. Roberts further argues that the ALJ's RFC assessment was unsupported by substantial evidence.

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2013). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.* at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through the application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Contrary to Roberts's assertions, the ALJ made a number of findings regarding Roberts's activities of daily living and also relied on Roberts's own statements in concluding that his impairments did not meet or equal any listed impairment. The ALJ also noted that none of Roberts's treating or examining physicians reported the necessary clinical, laboratory, or radiographic findings specified in the listed impairments. Moreover, Roberts fails to identify which listings he claims to meet or explain how he meets any listing. The single-sentence forms submitted by Drs. Miller and Litton in which they opine that Roberts meets or equals a listed impairment, with no further explanation, are insufficient to satisfy Roberts's burden of proof. The ALJ stated sufficient findings for his conclusion that Roberts's conditions did not meet or equal any listed impairment, and that conclusion will be upheld.

The ALJ's RFC assessment was also supported by substantial evidence. The ALJ was entitled to weigh conflicting evidence and make credibility determinations. He appropriately chose to credit those opinions that were supported by the objective evidence, such as the opinions of Dr. Lanthorne, Jennings, and Parker, while giving little weight to opinions that were unsupported by the record evidence, such as the opinions of Drs. Blackwell, Litton, and Spangler. The record revealed that Roberts had not suffered a seizure in a number of years, could perform a wide array of physical activities, including sports, graduated from high school with a standard diploma, regularly attended community college courses, and was generally functioning well on a daily basis. No objective evidence supported the opinions that Roberts would have to miss more than two or more days of work per month due to his impairments. Thus, based on my review of the record, I conclude that the ALJ's decision was supported by substantial evidence, and it will be affirmed.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: September 13, 2013

/s/ James P. Jones
United States District Judge